J-S30041-20

2020 PA Super 186

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
JASON WEBB :
:
Appellant : No. 148 WDA 2020

Appeal from the PCRA Order Entered November 18, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0007252-2014

BEFORE: MURRAY, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED AUGUST 10, 2020**

Appellant, Jason Webb, appeals from the order entered in the Court of

Common Pleas of Allegheny County dismissing his first petition filed pursuant

to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. § 9541-9546, raising

claims of ineffective assistance of trial counsel provided during his criminal

homicide trial. We affirm.

The trial court aptly provides the procedural history and underlying facts

of the present matter, as follows:

> On May 17, 2014, Appellant was arrested and charged with
> Criminal Homicide and Unlawful Possession of a Firearm by a
> Person not to Possess at CC No. 201407252. At trial, the Firearms
> charge was severed from the homicide charge and was given the
> CC Number of 201502048.
>
> On January 30, 2015, an Omnibus Pretrial Motion was filed at CC
> No. 201407252, which Motion contained the request to sever the

_____

[*] Former Justice specially assigned to the Superior Court.

firearms charge and motions to exclude autopsy photographs and video surveillance.

Appellant proceeded to a jury trial presided over by the Honorable Joseph K. Williams, III, on the homicide charge[. Appellant defended this case on a self-defense theory. He testified [as] the only defense witness.]

[The Commonwealth presented the following evidence:] On May 17, 2014, around 1:30 in the morning, Tezjuan Taylor left the Beer Barrel bar in McKeesport. He was walking through the nearby PNC Bank parking lot when 3 shotgun blasts rang out. Some of the shotgun pellets penetrated Mr. Taylor's body. He struggled to a nearby Sunoco minimart and collapsed on the floor. He died right there. Police arrived soon thereafter and began their investigation.

Audrey Smith was walking toward the Beer Barrel bar and saw Appellant. N.T, 6/8/15, at 112. She [knew] him for a long time. He was very upset. She [knew] this because when she greeted him ("What's up Jay?"), she got no reply and that was not like him. N.T. at 114. She sensed something was going to happen. N.T. at 119. Two people — one identified later as Tezjuan Taylor — left the bar and walked in the direction of the PNC parking lot. Ms. Smith then looked in that direction and saw "a motion." N.T. at 124. Appellant made that motion. It [was] a two handed motion like someone raising a gun. N.T. at 126. She duck[ed]. [She] [h]ear[d] a pop. It [was] a gunshot.

Ms. Smith's night was not over. She went into the bar, stayed awhile, and then walked home. That journey took her right past the mini-mart where the victim died. She made a general inquiry to a uniformed officer and kept walking. A bout of conscience made her come back. She was interviewed. She picked Appellant out of a photo array. N.T. at 139.

Denise Fink drives an unlicensed cab called a jitney. Ms. Fink picked Appellant up around 1:00 a.m [on the night in question]. They stopped at his mother's house a few blocks away. Appellant went in. A few minutes later he got back in the jitney. But, this time, he sat in the back seat. Then they drove to the Beer Barrel bar. It was not a long ride. The car parked a short distance away. Webb got out and walked toward the bar. Ms. Fink sat and waited for his return. Maybe 10 minutes later, Appellant returned. He

was not alone. Another male, in his early 20's, [got] in the front seat. Appellant [sat] in the back. The two of them talk[ed]. Two people walk[ed] by the car. All of a sudden, Appellant jump[ed] out of the car. He [had] a gun. It was not a pistol — it was a long gun. Ms. Fink [was] shocked. She saw the gun pointed toward the Sunoco mini-mart. She hear[d] gunshots; maybe two or three. They came one after the other. The shots stop[ped]. Appellant got back in the car. He had the gun and with a certain level of pride, he said, "that's what the motherfucker gets for killing Chauncy." N.T., 6/9/15, at 198.

Ms. Fink got out of there in a hurry. They returned to Appellant's mother's home. He got out with the gun. A few minutes passed, and Appellant reappeared with his girlfriend. They both got in the jitney. The girlfriend was scared. Appellant [told] Ms. Fink to return to the place she picked him up—a public housing project known as Crawford Village. Her car is [captured] on videotape at 2:00:38 [a.m.] N.T. at 208. Appellant got out of the car.

A few hours later, [according to Ms. Fink's testimony], police are pounding on [her] door. They questioned her and towed her car. A photo array was conducted in which she picked out the photo of Appellant as the person who was in her car with a gun. N.T. at 139.

[T]here was forensic evidence admitted against Appellant. Appellant's DNA was found on the handle of the shotgun. N.T, 6/10/15, at 124 In addition, the shell casings [recovered from the scene of the shooting] had markings which were consistent with being fired from the recovered gun. N.T. at 148.

As mentioned, Appellant testified. [According to Appellant's testimony,] [a]lmost immediately after leaving the bar, and before Appellant could get in the car, Mr. Taylor appeared. Appellant was near the rear passenger door and Taylor, on the driver's side, said "Where you going? Where you going, pussy? Don't run now." N.T. at 262, 302. Appellant [testified that he] grab[bed] the shotgun after Taylor reache[d] towards his short or waistband area. N.T. at 269, 304, 305. Appellant start[ed] shooting[, firing three shots,] all in [the] direction of Taylor. All with his eyes closed. N.T. at 306. He then jump[ed] into the car and [told] his driver, "Go, go, go— that's the guy that killed Chauncey; he got Chauncey." N.T. at 270. He [left] the scene. Appellant then [broke] the gun down into two parts and put one

in [the] sewer and the other in some nearby woods. N.T. at 277, 285, 287.

[Appellant's] version of events was not consistent with the events as described by Ms. Smith and Ms. Fink[, nor with] the physical evidence. As such, the jury was tasked with choosing [whom] to believe. They chose the government's version of events. Their review of that evidence included passing judgment on the elements of [Appellant's] self-defense claim. [The jury rejected Appellant's testimony that his life was in danger]. Ms. Smith and Ms. Fink described no interaction with Mr. Taylor at the car. Their testimony was supported by the physical evidence left at the scene. The government presented a case which, upon connecting the dots, one could [conclude] Appellant was . . . sitting in the car just waiting for Mr. Taylor to leave the bar.

A jury convicted Appellant of third-degree murder at CC No. 201407252 on June 9, 2015. On that same date, Judge Williams convicted Appellant of the severed firearms charge, now listed at CC No. 201502048. On September 14, 2015, Appellant entered a guilty plea to the charges at CC No. 201404482 [involving a separate, prior incident resulting in charges of Receiving Stolen Property, Possession of Firearm with Manufacturer Number Altered, Firearms Not to be Carried Without License, three counts of Possession of a Controlled Substance, and one count of Possession of Drug Paraphernalia].

Also on September 14, 2015, Judge Williams sentenced Appellant to fifteen (15) to thirty (30) years of incarceration for third-degree Murder, a concurrent two (2) years, six (6) months to five (5) years of incarceration on the Possession of a Firearm Prohibited charge, and a consecutive five (5) to ten (10) year sentence of imprisonment for Possession of a Firearm with Manufacturer Number Altered. Appellant was also sentenced to 10 years of Probation to follow his incarceration.

Trial Court Opinion, 4/15/16, at 1-4.

Appellant filed a counseled Notices of Appeal in the Superior Court of Pennsylvania from the judgments of sentence entered at all three docket numbers. On August 15, 2017, however, Appellant, through counsel, filed an

Application to Withdraw each appeal, and this Court entered orders discontinuing each on August 18, 2017.

On September 19, 2017, Appellant filed a *pro se* Petition for Post-Conviction Collateral Relief, his first. By Order dated September 19, 2017, the PCRA court appointed counsel to represent Appellant in his PCRA proceedings. Appointed counsel filed an Amended Post Conviction Relief Act Petition on behalf of Appellant on September 20, 2018 and subsequently filed a Modified Amended PCRA Petition on November 7, 2018. On March 15, 2019, the Commonwealth filed its Answer to Appellant's petitions.

On March 29, 2019, the PCRA court entered an order providing notice of its intention to dismiss Appellant's PCRA petition without a hearing, pursuant to Pa.R.Crim.P. 907. On November 8, 2019, the court entered an order dismissing Appellant's petition. This timely appeal followed.

In this appeal, Appellant raises five issues for our consideration:

1. Did the lower court abuse its discretion in finding no merit to the claims raised in the PCRA petition, and denying the petition without a hearing, where trial counsel ineffective for eliciting testimony regarding Mr. Webb's illegal drug activity, and for failing to submit a motion *in limine* to preclude any reference to such activity, where the evidence was irrelevant and/or not probative of the defense theory of self-defense or imperfect self-defense, and was highly prejudicial in that it portrayed Mr. Webb as being a criminal and having criminal propensities?

2. Did the lower court abuse its discretion in finding no merit to the claims raised in the PCRA petition, and denying the petition without a hearing, where Mr. Webb averred that trial counsel was ineffective for failing to request a cautionary instruction regarding the prior crimes evidence at the earliest possible moment rather than wait for the short two -paragraph

cautionary instruction that was buried in the long 127 paragraph series of instructions that were read to the jurors at trial?

3. Did the lower court abuse its discretion in finding no merit to the claims raised in the PCRA petition, and denying the petition without a hearing, where Mr. Webb averred that trial counsel was ineffective for not objecting to the admission of evidence that witness Audrey Smith was placed in the witness protection program, and that she selected Mr. Webb's photograph from a photo array at 5:30 a.m., from which the jury was left to deduce that it was a mugshot, insofar as that evidence was irrelevant and far more prejudicial than probative of any issue in the case?

4. Did the lower court abuse its discretion in finding no merit to the claims raised in the PCRA petition, and denying the petition without a hearing, where Mr. Webb averred that trial counsel was ineffective for failing to procure a cautionary instruction following Audrey Smith's testimony about the Witness Protection program, which instruction would have explained that the testimony was irrelevant to the crimes charged and cannot be used to prove that Mr. Webb was a dangerous person or otherwise has a propensity to commit a dangerous crime?

5. Did the lower court abuse its discretion in finding no merit to the claims raised in the PCRA petition, and denying the petition without a hearing, where Mr. Webb averred that trial counsel was ineffective for failing to properly preserve a challenge to the improper admission into evidence of a color videotape that had minimal probative value, and was so graphic that it injected undue emotion into the case, to Mr. Webb's prejudice?

Appellant's brief at 5.

Under the applicable standard of review, we determine whether the ruling of the PCRA court is supported by the record and is free of legal error. The PCRA court's factual findings will not be disturbed unless there is no support for the findings in the certified record. **Commonwealth v. Barndt**, 74 A.3d 185, 191-92 (Pa. Super. 2013) (citations omitted). We apply a *de*

- 6 -

*novo* standard of review to the PCRA court's legal conclusions.
***Commonwealth v. Blakeney***, 108 A.3d 739, 749 (Pa. 2014).

Our scope and standard of review is well settled:

In PCRA appeals, our scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party. Because most PCRA appeals involve questions of fact and law, we employ a mixed standard of review. We defer to the PCRA court's factual findings and credibility determinations supported by the record. In contrast, we review the PCRA court's legal conclusions *de novo.*

***Commonwealth v. Reyes-Rodriguez***, 111 A.3d 775, 779 (Pa. Super. 2015) (citations omitted).

To obtain relief under the PCRA premised on a claim that counsel was ineffective, a petitioner must establish by a preponderance of the evidence that counsel's ineffectiveness so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place. ***Commonwealth v. Johnson***, 966 A.2d 523, 532 (Pa. 2009). "Generally, counsel's performance is presumed to be constitutionally adequate, and counsel will only be deemed ineffective upon a sufficient showing by the petitioner." ***Id***. This requires the petitioner to demonstrate that: (1) the underlying claim is of arguable merit; (2) counsel had no reasonable strategic basis for his or her action or inaction; and (3) petitioner was prejudiced by counsel's act or omission. ***Id.*** at 533. A finding of "prejudice" requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Id*. A reasonable probability is one "sufficient to undermine confidence in the outcome of the proceeding." *Id.* (quoting ***Commonwealth v. Ali***, 10 A.3d 282, 291 (Pa. 2010)). A failure to satisfy any prong of the test for ineffectiveness will require rejection of the claim. ***Commonwealth v. Martin***, 5 A.3d 177, 183 (Pa. 2010).

In Appellant's first issue, he argues that defense counsel had no reasonable basis for eliciting highly prejudicial testimony from both Denise Fink and Appellant, himself, that Appellant was a low-level drug dealer at the time of the shooting. Specifically, counsel asked Denise Fink on cross-examination if she knew some "small-time drug dealers in the McKeesport area," and Fink named Appellant as one and stated that she had asked him for drugs dozens of times. N.T. 6/9/15 at 224-25. On direct examination of Appellant, defense counsel asked questions prompting Appellant to explain he had often given drugs to Ms. Fink as payment for jitney rides, including on the night of the shooting. N.T. at 242-43. On the Commonwealth's cross-examination of Appellant, the jury heard Appellant indicate that he sold crack cocaine and heroin. N.T. at 315.

Appellant argues that testimony of Appellant's drug sales was irrelevant to his justification defense or imperfect self-defense claim. In the alternative, he contends that even if relevant, evidence of his drug dealing was more prejudicial than probative, as it stripped him of his presumption of innocence and portrayed him as a bad person with criminal tendencies. We disagree.

- 8 -

On direct examination, Ms. Fink testified that at the time relevant to the present matter she worked as a nighttime jitney driver in the McKeesport area, accepting either money or drugs (usually heroin, sometimes crack cocaine) as payment. N.T., 6/9/15, at 172. On the night in question, Appellant called her for a ride to the Beer Barrel bar in McKeesport, purportedly to pick up his mother and take her home. N.T., 6/9/14, at 177-78. Fink picked up Appellant at about 1:00 a.m. and he got in the front seat of her Toyota Camry. N.T. at 179. He asked her to go first to his mother's home on Washington Street, where he entered and stayed for three to five minutes before returning to the car, but this time sitting in the back seat. N.T. at 181. Fink thought it unusual that Appellant didn't return to the front seat and asked him if he made a mistake, but he didn't answer. N.T. at 182-83.

Fink drove to the Barrel Bar and arrived to find it busy, so she parked several spaces up the street from the bar and Appellant exited the vehicle while Fink waited. N.T. at 185-86. Appellant entered the bar and returned to Fink's car moments later, not with his mother but with a friend he met up with in the bar. According to Fink, Appellant sat in the back seat holding a long-barreled gun while his friend sat in the front seat and advised her that "when [Appellant] says 'go,' go." N.T., 6/9/14, at 188.

Fink testified that they waited in her car just a short time until two men walked by the car, at which point Appellant sprung from the car quickly and fired multiple shots at the two men with a long gun, not a pistol. N.T. at 189, 197. Appellant jumped back in the car, directed a shocked Fink to drive away,

and declared, "That's what the motherfucker gets for killing Chauncey," a reference to a close acquaintance of his who was killed in a McKeesport shooting two years earlier. N.T. at 198. According to Fink, Appellant's attitude when making this statement was one of pride and excitement. N.T. at 199. She claimed he was hooting and saying, "wooh, yeah" while continuing to tell Fink where to drive. N.T. at 199-200.

Appellant was thus confronted with highly detailed and incriminating eyewitness testimony from Denise Fink, who essentially testified Appellant had ambushed an unsuspecting Taylor and killed him not in self-defense but in retaliation for the previous murder of a friend. He also faced both additional eyewitness testimony from Audrey Smith, who heard gunshots while simultaneously witnessing from a distance Appellant make what appeared to be a shooting motion with his hands, and other video and forensic evidence definitively putting him in possession of the murder weapon on the night in question. **See** *infra*.

Only Ms. Fink's testimony, however, provided direct evidence supporting the prosecution's first-degree murder theory that Appellant's shooting of Mr. Taylor was premeditated and without provocation. The defense, therefore, elected to employ an imperfect self-defense defense in which a primary task was to impeach Fink by recasting her as a habitual drug user who could neither perceive nor remember clearly the events surrounding the shooting, as Appellant had supplied her with narcotics during the jitney ride.

Thus, we cannot find the PCRA court abused its discretion when it reviewed this record and determined it was reasonable for defense counsel to reveal to the jury Appellant's status as a low-level drug dealer, if only to establish that Appellant had first-hand knowledge of both Fink's long-term drug addiction and her possession of drugs that he delivered to her in the jitney on the night of the shooting. Such evidence, if believed by the jury, could create reasonable doubt regarding her ability to assess Appellant's conduct and remember accurately what had happened. Her testimony in this regard was a central feature to the Commonwealth's first-degree murder proffer, which the jury chose to reject in favor of a verdict of murder in the third degree.

Even if we were to assume *arguendo* that counsel's strategy was unreasonable, we would find Appellant has also failed to prove the prejudice prong to his ineffectiveness claim, as he has not shown there was a reasonable probability that, but for counsel's alleged errors, he would have experienced a better result at trial. As noted above, Ms. Fink was not the sole source of damaging, detailed evidence implicating Appellant in the shooting of Mr. Taylor.

Audrey Smith was on familiar terms with Appellant, and she testified he appeared unusually agitated and failed to return her greeting when she saw him walking away from the Beer Barrel bar with another male. N.T. at 105-114, 148-51. Minutes later, she saw two men—one of whom was later confirmed to be Taylor—open the bar door and ask, "Where did they go," while

looking up the sidewalk in the direction of the Sunoco station. N.T. at 119-22, 155. She watched as they began walking toward the station, where, the trial record had otherwise established, they had parked their car. N.T. at 123, 160.

Smith remained outside the bar when she again saw Appellant, this time standing alone alongside Denise Fink's car parked some distance away from the bar. According to her testimony, Appellant then raised his arms as if preparing to fire a gun, and she instantly ducked as she heard shots fired. N.T. at 124-26, 28. When she looked up, she saw Fink's car pull out quickly and speed away. N.T. at 124, 129.

Smith eventually contacted Allegheny County Police and told them what she had witnessed. N.T. at 136-37. She received a transport to headquarters where she provided a statement implicating Appellant as the shooter and identified him from a photo array. N.T. at 138-39, 141.

Two men working security for the Beer Barrel bar also told investigators that they were forced to ask Appellant to leave the bar, and while they escorted him out one of them heard Appellant say he was "going to get that [N-word]." N.T. at 319. Video footage from inside the bar confirms Appellant and the other male were in the bar for only 90 seconds. N.T. at 289, 292. Taylor and James Wilson are also depicted in this footage, and they are seen leaving the bar about one minute after Appellant leaves. N.T. at 293.

Other evidence included testimony that McKeesport Police responded to a call placed less than 24 hours after the shooting reporting that a homeowner

had recovered a black shotgun receiver from the bushes in his yard. This property was in the same neighborhood as Appellant's mother's home. N.T. at 353-369. Furthermore, security footage from a building in McKeesport had captured someone dumping an object in a storm drain shortly after 3:00 a.m. on the date of the shooting. The municipal authority was dispatched to the scene and recovered the barrel end of a shotgun. The Allegheny County Medical Examiner's firearms expert testified that the barrel belonged to the shotgun receiver recovered from the bushes near Appellant's mother's home.

Forensic evidence collected after the crime included the recovery of Appellant's DNA from the grip and the slide of the shotgun. N.T. at 124, 135. Additionally, the shotgun pellets recovered from Taylor's body during autopsy were consistent with the shotgun shells recovered from the shooting scene. N.T. at 189-193. Finally, gunshot residue was recovered from the front passenger seat of Fink's vehicle, where Appellant sat after the shooting. N.T. at 33, 38, 77, 91.

Therefore, when viewed in the aggregate, the evidence of Appellant's guilt was overwhelming, such that we cannot say that counsel's decision to introduce evidence of Appellant's low-level drug dealing "undermined confidence in the outcome of the proceeding." *See Commonwealth v. Spotz*, 84 A.3d 294, 312 (Pa. 2014) (A reasonable probability of a different result is one "sufficient to undermine confidence in the outcome of the proceeding.") (quoting *Commonwealth v. Ali*, 10 A.3d 282, 291 (Pa. 2010)). Appellant's first issue fails.

In Appellant's second issue, he claims trial counsel was ineffective for failing to request a cautionary instruction regarding the prior crimes evidence at the earliest possible moment rather than waiting for the court to include such instruction in the jury charge. The delay in the charge, Appellant asserts, caused him undue prejudice.

"Where evidence of prior bad acts is admitted, the defendant is entitled to a jury instruction that the evidence is admissible only for a limited purpose." *Commonwealth v. Ivy*, 146 A.3d 241, 251 (Pa. Super. 2016). Moreover, "[i]t is presumed the jury follows the court's instructions." *Commonwealth v. Speight*, 854 A.2d 450, 458 (Pa. 2004).

Initially, because we have already determined that no undue prejudice befell Appellant by counsel's decision to introduce Appellant's drug dealing history for the purpose of impeaching Fink's testimonial capacity, we reject the notion that the lack of an *immediate* cautionary instruction explaining the limited purpose was, itself, independently prejudicial. Furthermore, the law is clear that such an instruction may be given as part of the general charge. *See Commonwealth v. Spotz*, 759 A.2d 1280, 1286 (Pa. 2000). In *Spotz*, the Pennsylvania Supreme Court explained:

> This Court has held that a limiting instruction may be given either as the evidence is admitted or as part of the general charge. *Commonwealth v. Covil,* 474 Pa. 375, 383, 378 A.2d 841, 845 (1977). Rule 1119(d) of the Rules of Criminal Procedure, adopted after *Covil,* likewise states that a trial judge may give instruction to the jury before the taking of evidence or at any time during the trial as the judge deems necessary and appropriate for the jury's guidance in hearing the case. Pa.R.Crim.P. 1119(d). The

Comment to the Rule reaffirms that the determination of when to charge the jury is discretionary with the trial court: It is intended that the trial judge determine on a case by case basis whether instructions before the taking of evidence or at any time during trial are appropriate or necessary to assist the jury in hearing the case. Furthermore, although the Court in **Covil** expressed a preference that trial courts give a limiting instruction at the time the evidence is introduced, where possible, **Covil** itself approved a determination in that case to postpone issuing the charge. 474 Pa. at 384, 378 A.2d at 846.

**Spotz**, 759 A.2d at 1286–87 (Pa. 2000).

Here, in pertinent part, the court charged the jury during the final instructions as follows:

**THE COURT**:    You've heard evidence tending to prove the defendant was guilty of an offense for which he is not on trial.  I am speaking of the testimony to the effect that the defendant distributed illegal drugs.

This evidence is before you for a limited purpose; that is, for the purpose of tending to show the defendant's relationship with Denise Fink.  This evidence must not be considered by you in any other way than for the purpose I just stated.  You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt.

N.T. at 387-388.

Under both controlling authority and the record before us, we perceive no arguable merit to Appellant's ineffectiveness claim assailing counsel's decision to allow the court to wait until the general jury charge before explaining the specific, appropriate purpose of the other crimes evidence. Juries are presumed to follow instructions, **Commonwealth v. Speight**, 854 A.2d 450, 458 (Pa. 2004), and the court's instruction specifically informed this jury just before it began its deliberations that evidence of Appellant's history

- 15 -

as a drug dealer was relevant for the limited purpose of understanding his relationship with Fink.

The jury had observed defense counsel develop this very theme during his extensive cross-examination of Fink, direct examination of Appellant, and in zealous closing argument, in which he characterized Fink as a skillful liar who had admittedly deceived her husband and family for years by using her nighttime jitney business as a front for accessing drugs. The jury, therefore, was well aware of the defense position that this illicit relationship between Appellant and Fink enabled Appellant to offer what could reasonably be perceived by the jury as an informed assessment that Fink was a compromised fact witness. Accordingly, we discern no merit to Appellant's claim that counsel was ineffective for allowing the court to give its limiting instruction at the end of trial rather than at the time defense counsel initially introduced evidence of Appellant's other bad acts.

Appellant's third and fourth issues coalesce to contend defense counsel ineffectively failed to object to or request a limiting instruction about the Commonwealth's line of questioning regarding Audrey Smith's placement in the Witness Protection Program. Counsel compounded the prejudicial effect stemming from such references during Smith's testimony, Appellant continues, by not objecting when the prosecutor elicited evidence that she picked Appellant's photo from a photo array shown to her at 5:30 a.m., which permitted the jury to infer the photo was a mugshot of Appellant.

The relevant notes of testimony show defense counsel did, in fact, lodge an objection at the outset of the Commonwealth's line of questioning aimed at eliciting Smith's narrative of how she reached out to police and expressed she was concerned about her safety:

> **PROSECUTOR:** Now, at some point when you're dealing with the police, that day, did you express to them concerns about your well-being, ma'am?
>
> **SMITH:** Of course.
>
> **DEFENSE COUNSEL:** I'm going to object as irrelevant, Your Honor.
>
> **PROSECUTOR:** Either at that time or at some –
>
> **THE COURT:** Wait a minute. Approach. (Whereupon the following discussion was held at sidebar).
>
> **THE COURT:** He objected about whether it was relevant or not, but I would hear your thoughts.
>
> **DEFENSE COUNSEL:** Just if she is going to testify that she worried because she knows him to be a violent guy or she is worried about any type of retribution, I would say this is not really relevant to the proceedings.
>
> **PROSECUTOR:** I'm not going to ask her why. It was just a segue. The fact that she's placed into the Witness Protection Program, I wasn't going to say, "Why did you ask to [do] that"?
>
> **DEFENSE COUNSEL:** Okay.
>
> **THE COURT:** Very well.
>
> (open court)
>
> **PROSECUTOR:** Did you make arrangements either initially on contacting the police or at some later time to enter into their witness production [sic] program?

- 17 -

**SMITH:** Not at that particular time, no.

**Q:** Okay. Was it at some later point that you made those arrangements with the detectives?

**A:** Just towards the preliminary.

**Q:** I'm sorry? Towards the time of the preliminary hearing?

**A:** Towards the preliminary hearing. And to be honest with you, I didn't want to go through with it.

**Q:** Go through with testifying at the preliminary hearing?

**A:** Right. I didn't want to today either. Honestly.

**Q:** Well, you did, in fact, testify at the preliminary hearing in this case?

**A:** Yes, I did.

**Q:** All right. At some time after that, was that when those arrangements were made to place you into the Witness Protection Program?

**A:** Yes.

**Q:** All right. I'm not going to ask you where you went to but did you leave the Pittsburgh area to go to some far away location?

**A:** I did because I needed to get out of here immediately. So I did leave for a while.

**Q:** And you were provided monies to get housing, to get food, to get other essentials of life by the police department?

**A:** Yes, but not like a great amount. But yes.

**Q:** Do you know about how much money it was all told that you received from the police while you were in Witness Protection?

**A:** Maybe like $700, $800. I don't know. I'm not sure.

N.T., 6/8/15/, at 141-44.

Appellant concedes that defense counsel initially objected to testimony Smith might offer indicating she feared Appellant's violent retribution if she were to testify against him, and the prosecutor agreed to refrain from asking why she entered the Witness Protection Program. Appellant posits, however, that counsel was nevertheless obligated to renew his objection—or at least request a limiting instruction—when the prosecutor continued to ask questions about Smith's request to enter the program, because the necessary implication of such testimony was that she believed she was placing herself in danger by testifying against Appellant.

Even if we agreed with Appellant that the prosecution's direct examination of Smith extended beyond a mere segue and conveyed, instead, that Smith was afraid harm would befall her if she testified against Appellant, we find the lack of a renewed defense objection—or to seek an instruction that Smith's inclusion in the program was not evidence that Appellant acted violently or in a threatening manner toward her—caused Appellant no prejudice.

The relatively brief testimony addressing Smith's fear of testifying and her resultant placement in the Witness Protection Program represented a minor aspect of Smith's lengthy testimony, the main focus of which was her eyewitness account of Appellant's and Taylor's respective actions outside the Beer Barrel bar leading up to the moment when she saw Appellant raise his arms in a manner consistent with firing a gun at the very moment she heard

several gunshots. Moreover, Smith never indicated that it was Appellant whom she feared, and she never suggested he did anything to intimidate her in her role as a witness.

We, therefore, find that what is ultimately detrimental to Appellant's claim is the overwhelming evidence of his guilt introduced at trial, as the Commonwealth's presentation against Appellant was substantial. Both Smith and Denise Fink provided independent, firsthand accounts of witnessing Appellant act as the sole shooter, with Fink adding that Appellant shot Taylor without provocation and celebrated the event immediately afterward. Video of the bar's interior minutes prior to the shooting showed an agitated Appellant wearing a hoodie and being escorted outside by bar security less than two minutes after he had first entered. Security video and forensic evidence placed the murder weapon in Appellant's hands just minutes after the shooting, and Appellant exhibited consciousness of guilt by changing his appearance the next day with a new hairstyle. Given this body of evidence, we cannot conclude Appellant demonstrated a reasonable probability that he would have obtained a different result but for counsel's failure to renew his objection to, or otherwise seek exclusion of, Smith's testimony regarding her entry into the Witness Protection Program.[1]

_____

[1] Appellant's related claim asserting counsel ineffectively failed to object to testimony that Smith picked Appellant from a photo array shown to her at 5:30 a.m., because the jury would have surmised the photo was a mug shot from a prior arrest, also fails to establish prejudice for the same reasons.

In Appellant's final issue, he argues trial counsel was ineffective for failing to raise an "undue prejudice" objection to the admission of a color videotape depicting the decedent Taylor entering a Sunoco Mini-Mart with his last steps before collapsing to the floor, dead. According to Appellant, the video had minimal probative value, given other evidence of Taylor's final moments, and was "so graphic that it injected undue emotion into the case, to [Appellant's] prejudice." Appellant's brief, at 33. Appellant posits, therefore, that such video evidence was inadmissible under Pa.R.Evid. 403 and violated his due process rights.

The record belies this claim, as trial counsel included within his Omnibus Pre-Trial Motion a motion *in limine* seeking exclusion of the store video surveillance footage, pursuant to Pa.R.E. 403 because the "gruesome and inflammatory" recording of Mr. Taylor's last moments was "likely to inflame the minds and passions of the jurors, and its evidentiary value does not outweigh the potential harm it poses to [Appellant's] right to a fair trial." Omnibus Pre-Trial Motion, 1/30/15, ¶¶ 6-10. The trial court, however, viewed the video at issue and determined it was "relevant and not so prejudicial [so as] to exclude it. The tape is rather short, maybe 2-3 minutes long[,] and

_____

We find additionally, however, that the claim also lacks arguable merit. Specifically, Appellant points to neither evidence at trial nor any other aspect of the record that established the photo was, in fact, a mug shot. Instead, he offers only speculation as to what the jury's impression of such testimony must have been—without addressing and eliminating the possibility that the photo was supplied by some other source. As such, Appellant has failed to develop this claim in any meaningful way.

while [] in color, the colors are not reproduced all that well." Trial Court Order, 2/12/15, at Trial Dkt. No. 10.

Appellant points to a subsequent hearing at which trial counsel offered no objection except to the authenticity of the video prior to its exposition to the jury, but counsel had already raised an unsuccessful motion to exclude the video based on undue prejudice pursuant to Rule 403, and he was not required to reissue the objection in vain later during trial. **See Commonwealth v. Stokes**, 78 A.3d 644, 652-53 (Pa.Super. 2013) (law does not require counsel to raise futile objections on decided matters). We therefore reject Appellant's ineffectiveness claim as lacking arguable merit.

For the foregoing reasons, we affirm the order denying Appellant PCRA relief.

Order affirmed.
Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/10/2020